## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Robert S. JOHNSTON, III and the
LIBERTARIAN PARTY OF MARYLAND

      Plaintiffs,

v.                                                                          Case No. _____

Linda H. LAMONE, in Her Official
Capacity as Administrator of the
Maryland State Board of Elections

      Defendant.

## **COMPLAINT**

Plaintiffs Robert S. Johnston, III, and the Libertarian Party of Maryland bring this complaint to prevent the Administrator of the Maryland State Board of Elections from carrying out certain provisions of state law that would in this case unconstitutionally deprive the Party of its status as a recognized political party in Maryland.  These provisions of Maryland law threaten to infringe the rights of Maryland residents to associate for political purposes, to nominate candidates to stand for election before their fellow Maryland voters, and ultimately to vote for those candidates.  Although these state-law restrictions may be constitutional in many situations, they are unconstitutional as applied to these plaintiffs.

There are two primary constitutional problems.  First, to requalify as a "recognized" political party after January 1, state law appears to require the plaintiffs to spend tens of thousands of dollars and countless hours collecting the signatures of at least 10,000 registered voters—most of them Democrats, Republicans, or unaffiliated voters—when the State's own records already show that more than 22,000 registered voters have officially registered with the state as Libertarians.  The State's interest in ensuring that there is a significant modicum of

1

support within Maryland for the Libertarian Party is simply not advanced one iota by requiring Maryland's 22,000 Libertarians to petition their non-Libertarian neighbors for permission to continue to participate in the political process.  Each plaintiff therefore seeks a declaration that, under the circumstances here, the requirement that a group of 22,000 voters must spend the bulk of the group's entire budget to collect signatures from 10,000 others who are mostly outside the group imposes an unjustifiable burden on political participation.

Second, the State's statutory standards for validating petition signatures purport to minutely regulate *how voters sign their own names*.  These rules may once have served the purpose of helping to identify registered voters and ensure the authenticity of voter signatures; indeed they may sometimes serve that purpose still.  But curiously, the State uses these standards to disqualify signatures from counting *even after the state has conclusively matched the disqualified signatures to real, live, registered voters.*  There is no state interest at all in refusing to count admittedly genuine signatures merely because the signer omitted a middle initial or signed "Sue" rather than "Susan."  Each plaintiff therefore requests declaratory relief on this count as well.

These significant restrictions on the rights of Libertarians and other Maryland voters to associate with and vote for Libertarian candidates are burdensome, but otherwise entirely pointless.  Because the State cannot constitutionally impose the signature collection requirement or apply the signature validation standard under these circumstances, the plaintiffs seek injunctive relief recognizing their continuing ability to nominate candidates throughout the state until December 31, 2022.  In support of their request for relief, the plaintiffs allege as follows:

## PARTIES

1.      Plaintiff Libertarian Party of Maryland ("Libertarian Party") is a political organization under Maryland's Election Law, with its principal place of business in Maryland. As of November 2018, the latest month for which official figures are available publicly, approximately 22,338 registered Maryland voters had officially "affiliated" with the Libertarian Party.  In other words, those 22,338 registered voters within the State of Maryland had asked the State to consider them to be Libertarians rather than Democrats, Republicans, Greens, or unaffiliated voters.

2.      Plaintiff Robert S. Johnston, III is a Maryland resident who serves as State Chairman of the Libertarian Party of Maryland.  In that capacity, Mr. Johnston is responsible for building the membership of the Libertarian Party of Maryland, increasing the number of registered voters in Maryland who choose to affiliate with the Libertarian Party, recruiting Libertarian candidates to run for office, and ensuring that the candidates recruited and nominated by the Libertarian Party appear on the State's official ballots.

3.      Defendant Linda H. Lamone is the Administrator of the Maryland State Board of Elections.  Ms. Lamone is Maryland's chief state election official.  Among other duties, she is responsible for voter registration and the recognition of political organizations such as the Libertarian Party as ballot-eligible political parties.  Ms. Lamone is also responsible for supervising the operations of all local election boards in Maryland.

4.      Plaintiffs are informed and believe, and on that basis allege, that defendant Lamone also controls, supervises, or directs the electoral functions of Maryland's Motor Vehicle Administration ("MVA").  In 2017 (the last year for which annual figures are available), over 75% of new voter registrations in Maryland were processed by the MVA.  Monthly data show

that MVA voter registrations have continued to predominate heavily in 2018.  Thus, to be effective in securing the constitutional rights of the plaintiffs, any relief granted in this case must be broad enough to encompass the MVA programs and activities that are, either officially or as a matter of custom, committed to Ms. Lamone's control, supervision, or direction.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the plaintiffs' claims arise under the Constitution and laws of the United States.  Specifically, the plaintiffs seek to vindicate their rights of association and political participation under the first and fourteenth amendments to the U.S. Constitution.  Congress has provided for private actions to protect these rights from being infringed under color of state law in 42 U.S.C § 1983, and has provided for the award of reasonable attorney's fees to successful parties under 42 U.S.C. § 1988.  The plaintiffs also seek declaratory and injunctive relief authorized by Congress in 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 65.

6.      This Court has personal jurisdiction over the defendant.

7.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b), because the defendant resides within this judicial district and a substantial part of the events giving rise to the claims occurred here.

## PARTY RECOGNITION IN MARYLAND

8.      Maryland law permits "recognized" political parties to nominate candidates directly to the general election ballot without the need for each individual candidate to collect signatures and file his or her own petition with state or local boards of elections.  To obtain these ballot access privileges for the first time, a new political party in Maryland is required, among other things, to submit a petition to the State Board of Elections.  "Appended to the petition shall

4

be papers bearing the signatures of at least 10,000 registered voters who are eligible to vote in the State as of the first day of the month in which the petition is submitted." Md. Elec. Law § 4-102(b)(2)(i).

9.     Once a political party has been recognized by the State, it automatically retains its status "until December 31 in the year of the second statewide general election following the party's qualification under § 4-102." Md. Elec. Law § 4-103(a)(1).  Statewide general elections occur every two years, so each successful petition enables a party to obtain ballot access benefits for at least two but no more than four years.  A successful new party petition filed on the date of this Complaint would entitle the petitioning party to maintain its official recognition and its ability to nominate candidates in the general election until December 31, 2022.

10.     A party, once recognized, can extend its ballot access privileges in two ways: by nominating a presidential or gubernatorial candidate who receives at least 1% of the total vote for that office; or by attracting the party affiliations of at least 1% of all registered voters.  Md. Elec. Law § 4-103(a)(2).  As of November 2018, there were approximately 4,018,891 active registered voters in Maryland.  Thus, the burdens on the right to vote that we will set forth in the rest of this Complaint are burdens borne only by *smaller* parties, parties other than the Democrats and Republicans.  These smaller parties could have 40,000 members statewide, but still fall short of the 1% threshold for affiliated registered voters.  Since the enactment of this provision of the Election Law, no party other than the Democrats and the Republicans has ever attracted the affiliation of more than 1% of registered voters.

11.     If a smaller party's candidate for Governor fails to attract enough votes for an automatic extension, the party must re-qualify "by complying with all the requirements for

qualifying as a new party under § 4-102." Md. Elec. Law § 4-103(c).  This means submitting a

new petition with the names of at least 10,000 registered voters, as described above.

      12.     The Libertarian Party has placed presidential candidates on the Maryland ballot

since at least 1980, and gubernatorial candidates since 2002.  The Libertarian Party enjoyed

ballot access privileges in Maryland for most of the elections since 2004, with short interruptions

for new petition drives.  The Libertarian Party has been continuously recognized, without

interruption, for the last six years, because it successfully petitioned for a renewal of its party

recognition in 2012 and then the Libertarian nominee for Governor attracted the votes of more

than 1% of all registered voters in Maryland's Gubernatorial General Election in 2014.

However, during the 2018 Gubernatorial General Election, plaintiff's nominee for Governor of

Maryland received approximately 13,241 votes, fewer than the approximately 23,045 votes (1%

of the total votes cast for Governor) necessary to extend the party's official recognition

automatically.  As a consequence, the Election Law on its face requires the party to submit a new

party recognition petition signed by at least 10,000 registered voters, even though more than

double that number of registered voters have already informed the State in the most official way

possible that they wish to affiliate themselves with the Libertarian Party.

**THE PETITION AND SIGNATURE VALIDATION PROCESS**

      13.     The solicitation, submission, validation, and counting of signatures on new party

recognition petitions is governed by sections 6-201 through 6-211 of the Election Law.  Some of

the standards apply to each signature and some apply to whole pages of signatures.  There are

rules against duplicate signatures for obvious reasons, and rules about the dates on which

signatures must be collected, but by far the most consequential rules are those that regulate the

ways in which voters must print and sign their own names.

14.     The rules governing signature validation and counting are complicated enough that, as a practical matter, petitioners hire professional petition circulators who collect signatures by standing in public places and asking passers-by if they will sign a petition in support of the petitioning party's access to the ballot.  It is slow work.  Circulators sometimes report that three hours of diligent, polite requests might produce many expressions of goodwill but fewer than twenty signatures.

15.     Significantly, the statutory standards do not require a voter who signs a party recognition petition to be affiliated with the petitioning party, or even to represent that he or she will vote for a candidate from the petitioning party.  And because the signatures come largely from random passers-by, approximately 99.5% of whom are not (yet) Libertarians, the vast majority of signatures on any successful ballot access petition by the Libertarian Party are from Democrats, Republicans, unaffiliated voters, and even a few (very sympathetic) Greens.

16.     Thus, a successful petition from the Libertarian Party, with the signatures of at least 10,000 registered voters on it, tells the State almost nothing about the level of support Libertarians currently enjoy within Maryland.  Indeed, throughout most of its history in Maryland, the Libertarian Party has successfully attracted at least 10,000 signatures for party recognition even when there were far fewer than 10,000 registered voters affiliated with the Libertarian Party.

17.     As noted above, most signatures are collected by professional circulators, at a cost of between $2.50 and $4.00 per collected signature plus expenses such as transportation and lodging.  If it were practicable to submit a successful party recognition petition with exactly 10,000 signatures, it would cost the Libertarian Party between $25,000 and $45,000 to collect those signatures and submit them for official validation and counting.

18.     This burden on the finances and other resources of a small party yields almost no information of any value about the level of support within Maryland for the Libertarian Party.

19.     The State's own records, which already show that that over 22,000 registered voters consider themselves Libertarians and have officially affiliated with the Libertarian Party, are both a more informative and a more reliable gauge of support for the Libertarian Party than the signatures of 10,000 registered voters who may not be Libertarians but who shop at Safeway would be.

20.     But in fact, a successful party recognition petition requires the collection of far more than 10,000 signatures.  Circulators who are collecting signatures in the field do not have access to voter registration databases, and many people who are kind enough to stop and sign the petition may be embarrassed to admit that they are not actually registered to vote.  Thus, signatures from non-voters inevitably make their way onto the petition pages.  In 2011, for example, the Libertarian Party submitted a party recognition petition with approximately 14,855 total signatures, and approximately 2,212 (14.89%) were later determined to be from people who were not registered to vote in Maryland.  Thus, as a practical matter, smaller parties must pay circulators to collect thousands of additional signatures in order to allow for the fact that some of the signers will not be registered to vote.

21.     In addition, Maryland's validation standards virtually guarantee the invalidation of many signatures that the State Board of Elections definitively identifies as having come from particular registered voters.  In 2011, for example, the State Board of Elections itself conceded that the Libertarian Party's petition contained the signatures of more than 12,000 registered voters whom the State itself identified by name; the State even altered each signer's official registration file to note that that he or she had signed the petition and relied on those signatures

for other purposes, such as updating the voter's address and determining whether the voter was active.  But the State Board nonetheless ultimately found over 6,000 of those signatures to be invalid because of one or more name-related defects.

22.     For example, a voter who is registered as Timothy Joseph Smith could validly sign as Timothy Joseph Smith, Timothy J. Smith, or T. Joseph Smith.  But his signature *would not count* if he signed as Timothy Smith, Joseph Smith, or T.J. Smith—even if any of those happened to be the way that Smith is known to the world and the way that Smith always signs his name.  This is because the statute requires at least one given name to be written out and at least one initial to be included for every given name.  Revealingly, "Timothy J. Smith" would count as a valid signature even if everyone knew him as Joe Smith and none of his friends or neighbors had the foggiest idea that his first name was Timothy.

23.     Similarly, if a voter who is registered as "Catherine Jones" printed her name as "Cathy Jones," her signature in support of the petition would be invalidated even if she properly *signed* "Catherine Jones."  This is because the State Board invalidates all nicknames.  This is something that is impossible for circulators to catch in the field, because sometimes "Don" is short for "Donald" but sometimes "Don" stands alone as the voter's full given name.

24.     The State's standards would lead to the invalidation of the signatures customarily affixed to legislation by Presidents George Washington and Thomas Jefferson (who abbreviated their first names when they signed them), Presidents Stephen Grover Cleveland, Thomas Woodrow Wilson, and John Calvin Coolidge, Jr. (none of whom used or signed their given first names), and Presidents Jimmy Carter and Bill Clinton (who used and signed nicknames).

25.     Maryland's current Governor, Lawrence J. Hogan, Jr., signs legislation with the name by which the world actually addresses him:  "Larry Hogan."  This signature, which he

affixes to legislative enactments of Maryland's General Assembly, would not count on a ballot access petition under the signature validation standards enforced by the defendants.

26.     All told, the State used these standards to invalidate almost 60% of the signatures on the Libertarian Party's 2011 petition, and *more than* 60% of the signatures on the Maryland Green Party's 2011 petition.  The Libertarian Party and the Maryland Green Party obtained temporary relief from the Circuit Court for Anne Arundel County, which adopted a saving construction of the relevant Maryland statutes in order to avoid constitutional difficulties. However, the State appealed and the Maryland Court of Appeals reversed, declining to address the effect on the Libertarian Party's constitutional rights.  *Md. State Bd. of Elections v. Libertarian Party of Md.,* 44 A.3d 1002, 1019 (2012).

27.     Consequently, for a party recognition petition to be safe from challenge under the State's interpretation of its validation standards, the sponsoring party should probably collect at least 25,000 signatures, raising the cost burden on smaller parties to something more like $65,000–$110,000.  This burden on the finances and other resources of a small party cannot be justified by the meager informational value of the petition to the State when the State's own records show that that over 22,000 registered voters—each of them already verified *by the State itself*—consider themselves Libertarians and have officially affiliated with the Libertarian Party.

28.     Although the defendants use these signature standards to refuse to count thousands of genuine signatures on every petition, they do not treat the uncounted signatures as legal nullities for all purposes.  For example, even if Catherine Jones had her signature invalidated because she printed "Cathy," the elections official reviewing her signature would still check the statewide voter registration database to see if there were indeed a Catherine Jones with the same birth date at the address given on the petition.  If so, the reviewer would make a note in

Ms. Jones's voter file to record the fact that she signed the petition.  This note would be

sufficient to move Ms. Jones from "inactive" to "active" status in the State's elections records.

29.     If Ms. Jones were then later informed that her signature had not been counted

because she printed her name as "Cathy," she *could not* correct her mistake by signing the

petition again; her second attempt would be disqualified as a "duplicate" signature even though

the first attempt had not been counted.  In 2011, over 500 signatures on the Libertarian and

Green petitions were invalidated as duplicates even though no valid first signature was ever

counted.

30.     Sometimes, the State even uses disqualified signatures to update voter

information.  That is, sometimes the State can identify a registered voter uniquely by the

combination of name, address, and birth date information.  For example, suppose that a petition

were signed by a Judson Van Danderslaven at 123 Market Street, and the reviewer noticed that

the voter registration records showed a Judson B. Van Danderslaven with the same birthday and

in the same town but with a different street address.  Under these circumstances, the reviewer

would not only note officially that Mr. Van Danderslaven signed the petition; the reviewer would

also use the address listed on the petition to *change* the address given in Mr. Van Danderslaven's

voter registration file.  But even after using Mr. Van Danderslaven's signature as the basis for

altering the State's official records, the State would still not count Mr. Van Danderslaven's

signature because he omitted his middle initial.

31.     There is therefore a strong element of make-believe or pretense underlying the

State's application of the signature collection requirement and the signature validation standards.

By requiring 10,000 signatures from the Libertarian Party to extend its ballot access through

2022, the State pretends to be in doubt about whether at least 10,000 registered voters support

ballot access for the Libertarian Party, even though its own voter registration rolls show that over 22,000 support not just ballot access but the principles of the party itself.  And if and when such a petition is submitted, the State will once again pretend not to know that Cathy is Catherine or that Larry is Lawrence, even after the State has looked at their signatures, identified Catherine and Lawrence as the registered voters who signed the petition, made a note on Catherine's and Lawrence's voter registration files that states conclusively that they signed the petition, and perhaps even changed Lawrence's address to, say, the Governor's mansion.  The State essentially claims the prerogative of knowing who Cathy and Larry are for almost all official purposes, while pretending not to know who they are for the one official purpose Cathy and Larry had in mind when they signed the petition:  the purpose of keeping Libertarians on the ballot.  In this way, the State effectively subordinates the constitutional rights of the plaintiffs and thousands of like-minded Maryland voters to a pointless game of make-believe.

## COUNT ONE:  PARTY RECOGNITION

32.     Plaintiffs incorporate by reference paragraphs 1 through 31.

33.     Maryland's requirement that the Libertarian Party collect 10,000 signatures burdens the plaintiffs' rights of speech, association, and political participation, guaranteed by the first and fourteenth amendments to the U.S. Constitution and enforced by 42 U.S.C § 1983.

34.     Maryland's requirement that the Libertarian Party collect 10,000 signatures, overwhelmingly from non-Libertarians, when the Libertarian Party already has over 22,000 members registered with the State, is unreasonably burdensome, and not narrowly tailored to meet any compelling or legitimate state interest.

35.     The plaintiffs are entitled to a declaration that they need not submit a new party recognition petition at this time in order to extend the State's recognition of the Libertarian Party through December 31, 2022, and to appropriate injunctive relief.

36.     The plaintiffs are entitled to an award of reasonable attorneys' fees for the successful vindication of these rights.

### COUNT TWO:  SIGNATURE VALIDATION

37.     Plaintiffs incorporate by reference paragraphs 1 through 31.

38.     Maryland refuses to count the signatures of known registered voters toward the 10,000-signature requirement on new party recognition petitions, and sometimes disqualifies signatures as "duplicates" even after refusing to count a first signature.  These policies burden the plaintiffs' rights of speech, association, and political participation, guaranteed by the first and fourteenth amendments to the U.S. Constitution and enforced by 42 U.S.C § 1983.

39.     Maryland's refusal to count the signatures of known registered voters toward the 10,000-signature requirement on new party recognition petitions, and its disqualification of signatures as "duplicates" even when they have never been counted once, is unreasonably burdensome, and not narrowly tailored to meet any compelling or legitimate state interest.

40.     The plaintiffs are entitled to a declaration that the State is obligated to count the signatures of all registered voters they have actually identified toward the 10,000-signature requirement on new party recognition petitions, and to appropriate injunctive relief.

41.     The plaintiffs are entitled to an award of reasonable attorneys' fees for the successful vindication of these rights.

**PRAYER FOR RELIEF**

42.     As to Count One, the plaintiffs seek a declaratory judgment that (a) as of January 1, 2019, the Libertarian Party's total registered voters (more than 22,000) demonstrated more support for the Libertarian Party within the State of Maryland than would be demonstrated by a petition bearing the signatures of 10,000 people who are overwhelmingly not (yet) Libertarians; (b) that the State may not constitutionally require the Libertarian Party to collect 10,000 signatures for a new party recognition petition when the State's own records show that over 22,000 registered voters have already affiliated with the Libertarian Party; and (c) that the Libertarian Party is entitled to official recognition through December 31, 2022, as if it had submitted a petition with 10,000 valid signatures.

43.     As to Count Two, the plaintiffs seek a declaratory judgment (a) that the U.S. Constitution forbids the invalidation of petition entries for defects found in printed names if the missing elements are supplied by the corresponding signed names, or vice versa; (b) that the U.S. Constitution forbids the invalidation of petition entries merely because the signer omits an unused first or middle name, or uses a nickname, when writing his or her full name or signature; (c) that the U.S. Constitution forbids the invalidation of petition entries for name-related defects if the entry contains address or birthdate information from which the signer's identity can be corroborated; and (d) that no signature should be considered a "duplicate" unless a signature from the same voter has previously been *validated*.

44.     As to both counts, the plaintiffs seek appropriate injunctive relief (as necessary) to enforce the rights so declared.

45.     As to both counts, the plaintiffs seek the costs, expenses, and attorneys' fees reasonably incurred by them in the prosecution of this action.

46.     The plaintiffs also request such other or additional relief as may later appear to the Court to be right and just.


December 27, 2018                               Respectfully submitted,

                                                _____
                                                Mark A. Grannis (Bar No. 19552)
                                                Mark D. Davis (Bar No. 19543)
                                                HARRIS, WILTSHIRE & GRANNIS LLP
                                                1919 M Street, N.W., 8th Floor
                                                Washington, D.C. 20036
                                                Telephone: 202-730-1300
                                                *mgrannis@hwglaw.com*
                                                *mdavis@hwglaw.com*

                                                *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 27, 2018, a copy of the foregoing and accompanying materials was mailed via Certified Mail to the Attorney General for the State of Maryland and to Linda H. Lamone, in Her Official Capacity as Administrator for the Maryland State Board of Elections.

December 27, 2018

Respectfully submitted,

Mark A. Grannis (Bar No. 19552)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*mgrannis@hwglaw.com*

*Counsel for Plaintiffs*