**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Robert S. JOHNSTON III and the
LIBERTARIAN PARTY OF MARYLAND

     Plaintiffs,

v.                                 Case No. 1:18-cv-03988-CCB

Linda H. LAMONE, in Her Official
Capacity as Administrator of the
Maryland State Board of Elections

     Defendant.

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

     The plaintiffs in this case argue that it is unconstitutional to condition the Libertarian Party's ballot access on its willingness to spend $100,000 on a totally pointless act:  namely, to collect 10,000 signatures which tell the State nothing it doesn't already know.  The act is pointless because the only possible justification for the requirement is to demonstrate that at least 10,000 voters in Maryland want the Libertarian Party on the ballot, but the State already knows that because it knows there are 22,464 voters who registered as Libertarians.  In our view, the Constitution does not permit Maryland to condition voting rights on a totally pointless but very expensive act, just because we're small.  The Constitution no more permits this than it permits the State to condition ballot access on our burning $100,000 in cash in front of the Maryland State House.

     The defendant's Opposition [Dkt. 13, 14] does eventually address our constitutional argument from pointlessness, in a little more than 500 words that begin on page 29 and end on

page 31.  For most of the Opposition, however, the defendant tries very hard to change the subject, in order to discuss some argument we are not making.  The defendant's exploration of the modern history of party recognition and ballot access in Maryland (Opp'n at 4-11) is well written and interesting, but beside the point; we are not arguing that the quota of 10,000 signatures is too high, or that Maryland's laws on ballot access are worse than those in other states.  The defendant's characterization of Maryland's system as a "two-tier" system is also interesting, but nothing turns on it; we do not challenge the statutory system itself, and *pointless* obstacles to electoral participation are no more constitutionally acceptable in a two-tier system than in any other.  Least helpful, perhaps, are the copious citations to Fourth Circuit decisions on all manner of other ballot access questions that have nothing to do with our case—including *Mathers v. Morris*, 515 F. Supp. 931 (D. Md.), *aff'd*, 649 F.2d 280 (4th Cir.), *aff'd*, 454 U.S. 934 (1981), which the Opposition touts like Geraldo Rivera touted the Mystery of Al Capone's Vaults, to similar effect.

The defendant also attempts to minimize the burden imposed by the State, suggesting at one point that perhaps recent clarifications of the rules on how Maryland voters must write their own names might enable the plaintiffs to retain their ballot access by collecting only 150% of the required 10,000 signatures, instead of the 250% that our 2011 experience implied.  Opp'n at 20. But again, it hardly matters; to return to the image of burning cash in front of the Maryland State House, it's not as if a requirement to burn $100,000 would be plainly unconstitutional but a requirement to burn $50,000 would be a closer question.  The problem is on the other side of the scales:  Maryland learns nothing new, fosters nothing good, and prevents nothing bad by imposing this burden on us while pretending not to know what's in the State's own files.  It is the

pointlessness of the requirement in our factual situation that makes it unconstitutional to apply the signature-collection requirement to us.

When the Opposition gets around to this question, it proposes two ways in which it *might* not be *totally* pointless to require us to collect 10,000 signatures even though we already have 22,464 registered voters.  These two very imaginative justifications are not just speculative; they are desperately far-fetched.  It is not at all plausible to speculate that voters who register with the Libertarian Party would *not* want the party to be recognized by the State; that's just silly.  And while party affiliations do differ from petition signatures in that the latter go "stale" after two years, it seems counterintuitive to treat the *more permanent* indicator of voter support, the one specifically protected from alteration under state law, as *less important*.  Moreover, nothing in state law requires the larger parties to demonstrate that *their* registered voters have made or would make a "fresh" choice for the party, so the State cannot rely on any such justification when it comes to the Libertarians.  *See* Md. Code Ann., Elec. Law § 4-103(a)(2) (granting larger parties continued ballot access based on their voter registrations, without regard to staleness). And finally, despite the volume of legislative history material the defendant has supplied regarding ballot access legislation in Maryland, there is not a single word in the Opposition to suggest that the legislature ever had either of the Opposition's two imagined justifications in mind.

Nor does the Opposition effectively rebut our showing on the likelihood of irreparable harm, the balance of the equities, or the public interest.  Yes, we suppose we could do a mass mailing to the 25,000 registered voters *per month* who would sign voter registration forms while this case remains pending, but (leaving aside the cost) the defendant cannot seriously maintain that this would put us in the same position as having our name on the form; if it doesn't put us in

the same position, it's not an adequate remedy.  Yes, there are other parties who lost their

recognition but have *not* sued or asked for injunctive relief, but that's how injunctive relief

*pendente lite* generally works; the party that first complains of the constitutional violation often

gets the appropriate remedy before others do.  Yes, it's certainly possible that a ruling for the

plaintiffs would prompt other parties to make other constitutional arguments, but if the treatment

of small parties under State law is constitutionally suspect, that's what is *supposed* to happen; the

administrative burden of responding to complaints of unconstitutional treatment is no

justification for continuing to treat people unconstitutionally—least of all the parties already

before the Court.

The foregoing is the gist of our reply.  We elaborate these points below, but the hearing is

tomorrow so we will be brief.

## ARGUMENT

Fortunately, the parties agree on the standard for temporary injunctive relief, *see Winter

v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), and we agree in most respects

on the constitutional standard for ballot access restrictions, *see Burdick v. Takushi*, 504 U.S. 428,

434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  We disagree only on

whether the signature-collection requirement in this case should be considered a "severe" burden

under existing precedent, which would require the defendant to show that it was "narrowly

drawn to advance a state interest of compelling importance."  *Burdick*, 504 U.S. at 434 (quoting

*Norman v. Reed*, 502 U.S. 279, 289 (1992)).  But the truth is that the signature-collection

requirement flunks even rational-basis review.  The real source of the disagreement in the papers

is that the defendant trains almost all of its fire on arguments we are not making.

I.      **Plaintiffs Are Likely to Succeed on the Merits of Their As-Applied Challenge to the Signature-Collection Requirement.**

The plaintiffs challenge the signature-collection requirement *only* as applied to a party that already has more than 22,000 registered voters—a fact the Opposition seems often to overlook—and *only because* the State purports to require more signatures than the then-current number of registered voters in the party—a fact the Opposition seems often to obscure.  Contrary to the repeated suggestions in the Opposition, we do not contend that there is something unconstitutional about a so-called "two-tier" system (that is, requiring a higher threshold of support for *renewal* of recognition while requiring a lower threshold of support for *initial* recognition).  We do not contend that either the 10,000-signature threshold for initial recognition or the one-percent threshold for retention is too high, nor do we contend that they are in conflict in any way.

Our argument is rather that *the State's own files* already disclose the existence of the 10,000 supportive voters whom the signature-collection requirement purports to require us to "find."  This renders the requirement and its associated burden entirely pointless, and therefore constitutionally unsustainable.  Memo at 15-22.  Collecting 10,000 signatures would actually tell the State *less* than it already knows, because most petition-signers will support Libertarian ballot access without necessarily supporting Libertarians, whereas the registered Libertarians who are already in the State's voter registration files have already expressed their support for both.  We object to the signature-collection standard not because the number is too high but because it is completely pointless, and the State cannot impose totally pointless burdens on electoral participation without running afoul of the Constitution.

**A.      This Court Should Demand a Compelling Government Interest, But Actually the Signature-Collection Requirement Lacks Any Rational Basis.**

In our opening memo, we explained that the 10,000-signature requirement at issue here imposes a severe burden on the Libertarians. As Plaintiff Johnston explained in his Declaration, complying with this requirement "will soak up essentially all of our small party's budget for the two-year period, and then some, to say nothing of the hours of volunteer time that would be required," which would amount to thousands of hours. *See* Johnston Decl. ¶¶ 10-11. We explained that laws that make it difficult for smaller parties to nominate candidates for the general election are generally viewed as "severe" restrictions on voting rights, which are subject to strict scrutiny.

The defendant disputes that these burdens are "severe" because they "plainly do not prevent non-principal parties from accessing the ballot in Maryland." Opp'n at 18. But the Fourth Circuit has explicitly rejected this test. In *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1221 n.7 (4th Cir. 2014), the Fourth Circuit explained that the test is not whether a restriction actually prevents a party from obtaining access to the ballot. The test is whether it makes ballot access "difficult," even if not impossible. *Id.* (noting that "strict scrutiny can apply to laws which 'mak[e] it difficult, but not impossible, for a new political party to obtain a position on the ballot.'"); *quoting Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993) (applying strict scrutiny to requirement that voter disclose a Social Security Number). A burden that would "soak up essentially all of our small party's budget for the two-year period, and then some," Johnston Decl. ¶ 10, plainly meets that standard, so strict scrutiny applies.[1]

---

[1]   The defendant's assertion that "nine different parties have achieved recognition via the petition process in Maryland since 1996," Opp'n at 17, deserves brief comment. The fact that virtually all small parties in Maryland have always had to requalify following the "new party" procedure may have led the State to treat the Constitution Party and the Taxpayers

The defendant also suggests that strict scrutiny does not apply because *Mathers v. Morris* somehow resolved the issue. But *Mathers* did no such thing. In *Mathers*, unlike in this case, the plaintiffs argued that it was unconstitutional for Maryland to apply a two-tier system—*i.e.*, to apply a different standard for initially obtaining party recognition than for maintaining that status. In that context, the district court did comment that Maryland's 10,000-signature requirement to qualify as a new party was a "relatively minor restriction." Opp'n at 15. But that was dictum because, as the court explained, "[t]he plaintiffs do not challenge the constitutionality of the general organizational requirements for a new political party under the statute." *Mathers*, 515 F. Supp. at 936. Moreover, while the district court's judgment was affirmed in a two-paragraph Fourth Circuit opinion and a one-sentence Supreme Court opinion, there is no reason to think that either court even considered—much less adopted—this dictum. Indeed, the Fourth Circuit applied strict scrutiny to lesser burdens.

---

Party as distinct, but in real life both names refer to the same party; it just changed its name in September 1999. A similar observation might be made about the Populist Party and the Independent Party, which were the vehicles for Ralph Nader's presidential campaigns in 2004 and 2008, respectively, and had (as far as we know) little or no further purpose or existence in the state. We of course do not (yet) have access to the defendant's voluminous statistics on party activity within the state, but we do not believe the Reform or Natural Law Parties have not nominated any candidates in Maryland since 2000; we do not believe the Americans Elect Party has *ever* nominated any candidates in Maryland. Thus, to the extent the defendant is suggesting either that Maryland is some sort of small-party paradise, or that Maryland has to keep its standards up or it the place will soon be overrun by hordes of smaller parties, we ask the Court to withhold judgment on that point until the matter can be explored further in discovery. We think the historical record on this is pretty grim. If it shows anything, perhaps it shows how ballot access restrictions focus virtually all the resources of smaller parties on achieving party recognition, unfortunately diverting those same resources away from the additional speech they could have supported on matters of public importance. *Cf. Mathers*, 515 F. Supp. at 938 (noting that signature petition requirements tend to divert resources away from campaign speech whereas conditioning requalification on electoral success rewards a party's "direct effort to elect its candidates in the state-wide elections").

In any event, the signature-collection requirement cannot be constitutionally applied in this case even if strict scrutiny does not apply.  As the defendant concedes, even if strict scrutiny does not apply, the court still must weigh "'the character and magnitude of the asserted injury' … against 'the precise interests put forward by the State as justifications of the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  Here, the defendant cannot identify any state interest that is advanced by requiring the 22,464 Libertarians the State already knowns about to obtain 10,000 signatures to demonstrate the existence of at least 10,000 voters who support recognition for the Libertarian Party under state law.  Accordingly, the requirement cannot be sustained.

### B.     The Constitutionality of "Two-Tier" Electoral Systems Is Not the Issue.

The defendant's primary argument, at least by volume, boils down to the following syllogism:  Maryland has a two-tier system, and two-tier systems are constitutional; ergo, Maryland's system is constitutional.  But we are not challenging the structure of Maryland's system; only the application of one of its requirements to us under circumstances that make it a pointless imposition.  And contrary to the defendant's argument, we have no problem whatsoever with so-called "two-tier" systems, here or in any state.  The defendant seems consistently to misunderstand our argument on this point.

Indeed, one of the most striking claims in the Opposition is that all of *our* arguments were decisively rejected for the entire Fourth Circuit thirty-eight years ago in *Mathers v. Morris*, 515 F. Supp. 931 (D. Md.), *aff'd*, 649 F.2d 280 (4th Cir.), *aff'd*, 454 U.S. 934 (1981).  The defendant claims that *Mathers* rejects *our* argument that it is unconstitutional for a state to

require a more difficult showing to retain ballot access than to gain it for the first time.  Opp'n at 1-2.  But that's not our argument.

As we have already stated, the plaintiffs' core contention is that when the State's own records show that there are 22,464 Libertarians in Maryland, it is completely pointless for the State to require those 22,464 Libertarians to go out and collect 10,000 signatures for the ostensible purpose of showing that there are at least 10,000 voters who want Libertarians on the ballot.  All or virtually all of the 22,464 registered Libertarians want Libertarians on the ballot, and the State knows it.  The Constitution does not permit them to pretend otherwise at our considerable expense.

None of this has anything at all to do with so-called two-tier electoral systems, in which (according to the Opposition) "the initial threshold for a party to obtain formal recognition so as to be able to nominate candidates in elections—the first of the two 'tiers'—is set at a lower level than the threshold for continued recognition."  Opp'n at 1.  Unlike plaintiffs in many of the cases cited by the defendants, we do not claim that 10,000 signatures is too many to require, nor do we claim that one percent of registered voters is too many affiliations to require.  Our claim is strictly about the uselessness of the errand on which the State wishes to send us.  To make clear that our argument has nothing to do with the number 10,000, the number one percent, or any relationship between them, we will restate the argument without any numbers at all:  The State is withholding ballot access from the Libertarian Party, and withholding the benefits of wider electoral competition from Maryland voters generally, unless and until the plaintiffs spend huge amounts of time and/or money to compile signatures that serve *no useful purpose*.  The Constitution forbids this as surely as it would forbid a law restricting ballot access to those who can and do burn $100,000 in cash in front of the Maryland State House.

How can the defendant misunderstand us so?  Because there are in fact quite a number of cases in which plaintiffs have challenged party recognition standards as too strict, and States have often prevailed in such cases by pointing to the important state interest of ensuring that ballot-eligible parties have a "significant modicum of support," in the oft-repeated words of *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).  By treating us as if we were making the same challenge raised in cases like *Mathers* and *McLaughlin*, the defendant acquires the advantage of treating those earlier decisions as if they decided this case.  They do not.

In *Mathers*, there were two claims raised regarding the total number of signatures required.  The candidate plaintiff, Mr. Mathers, argued first that it was unduly burdensome and unconstitutional to require him to collect 5,436 signatures by March 16, 1981, three weeks before the primaries in a special election.  515 F. Supp. at 933.  The court agreed, and the Fourth Circuit affirmed; Mathers was entitled to have his full complement of signatures counted when he submitted them several weeks later on April 7, 1981.  *Id.*  The second claim involved whether Mr. Mathers could be identified as a Libertarian on the ballot, and this turned not on whether Mr. Mathers had submitted enough signatures in time to get on the ballot, but on whether the Libertarian Party had submitted enough signatures in time to requalify as a ballot-eligible party. Because the Libertarian Party had known of the need to collect signatures since the preceding November election, the court held that it was reasonable to require 10,000 signatures.  515 F. Supp. at 937.  Significantly, the opinion tells us nothing about how many registered voters might have been affiliated with the Libertarian Party at the time, for the obvious reason that—as the defendant informs us—"until 1998, there was no way for a party to retain its State recognition based on party registration alone."  Opp'n at 6.  In other words, our claim in this case—that the State cannot constitutionally pretend not to know that there are at least 10,000 registered voters

who support ballot access for Libertarians when there are 22,464 registered Libertarians in the

State's files—is a claim that *Mathers* could not have settled because it could not even have been

raised.  (We do not know how many registered voters were affiliated with the Libertarian Party

of Maryland in 1981, but we assure the Court it was nowhere close to 10,000.)  *Mathers* is

completely irrelevant to this case.

Likewise, in *McLaughlin v. North Carolina Board of Elections*, as we noted in our

opening memo, the Libertarian Party of North Carolina could not possibly have raised the

argument that we raise here, because there were only 677 registered Libertarians in that party at

the time.  Memo at 21 (citing *McLaughlin*, 65 F.3d at 1220).  The other cases cited by the

defendant are similarly inapposite.  There is, in fact, *no case* cited by the defendant that

addresses whether a state may require a party to collect *X*-thousand signatures when the state

already has more than *X*-thousand registered party members on file.  That is the question this

Court must decide.

### C.      The Defendant Has Not Articulated Any State Interest that Rationally Justifies Enforcement of the Signature-Collection Requirement Here.

The only portion of the Opposition that squarely confronts the argument we *are* making

is Part I.B.3 (Opp'n at 29-31).  There the defendant takes issue with our assertion that the State

already knows that registered Libertarians support ballot access for Libertarians, for two reasons.

Neither is credible.

First, the defendant argues that we cannot assume that registered Libertarians will support

ballot access for Libertarians; the Opposition concedes this is "possible" but asserts that "it is

also possible that the same voter would *decline* to sign a new party petition upon learning that

the party had lost its recognition."  Opp'n at 30.  Apart from being pure speculation, this is

totally implausible, except perhaps in a trivial sense.  Yes, trivially, it is "possible" that a

registered Libertarian might decline to sign a new party petition for Libertarians, because lots of people who support ballot access decline to sign petitions for lots of reasons having nothing to do with their views on ballot access.  They might be worried about giving their address and birth date information to a stranger outside a grocery store.  They might just be in a hurry as they exit the store.  A Libertarian here and there, we concede, might decline to sign because his checkout experience might have left him emotionally overwrought about the effects of national agricultural policy on food prices.  None of these reasons for declining to sign a petition would in any way distinguish the meaning of a petition signature from the meaning of a voter affiliation in the way the defendant hypothesizes.

If one defines the relevant government interest as "getting 10,000 people to sign a government form," then of course the defendant's argument works but only because it is entirely circular.  But the "important state interest" at stake here is to ensure that there is "some preliminary showing of a significant modicum of support," *Jenness,* 403 U.S. at 442; there is no important state interest in *getting forms signed as such*.  The defendant's suggestion that *some* of the 22,464 registered Libertarians might "decline to sign" if presented with a new party petition is therefore totally beside the point as far as any important governmental purpose is concerned. There is no rational basis for supposing that a group of 22,464 registered Libertarians could contain fewer than 10,000 registered voters who support Libertarian ballot access.  This attempt at justification by the defendant is best forgotten.

The defendant's second argument is that the signature-collection requirement incorporates an element of recency that is missing from party affiliations, because signatures on new party petitions must be collected within a two-year period whereas voter affiliations can be based on registrations made many years ago.  Opp'n at 30.  But voters who register as

Libertarians have every incentive to update their registrations if they no longer support the Party, because the Libertarian affiliation prevents that voter from participating in the closed primaries of Maryland's Democrats and Republicans—or any other party nominating process, for that matter. *See* Johnston Decl., Ex. B, at 62 ("You must register with a party if you want to take part in that party's primary election, caucus or convention.").

The defendant nevertheless argues that only the most recent voter registrations should count. Picking up on the plaintiffs' own evidence that there are on average 243 new Libertarian registrations each month, the defendant calculates that this would only yield 5,832 new Libertarians in any two-year period, "well short of the required 10,000." Opp'n at 31. The primary problem with this undoubtedly inventive argument is that the State does not require any demonstration of recency from the larger parties. *See* Md. Code Ann., Elec. Law § 4-103(a)(2) (granting larger parties continued ballot access based upon their voter registrations without regard to staleness). The Republicans and Democrats are not required to show that their affiliations are particularly recent; an affiliation is an affiliation. If the Libertarian Party had affiliations from about 20,000 more registered voters, no showing of recency would be required from the Libertarian Party either. Indeed, in 2017, every recognized party in Maryland besides the Libertarian Party *shrank*, Johnston Decl. Ex. A, at 10, but the State did not revoke any party's recognition on the ground that it had failed to gain *new* members equal to at least one percent of all registered voters. In short, recency simply is not a requirement for ballot access generally; it is only a requirement for petitions. If the State does not require the larger parties to "refresh" their voter registration affiliations in any way, then it cannot pretend that recency is an important state interest underlying the ballot access rules.

In addition, it is worth noting that the reason the affiliation decisions of registered voters are not "refreshed" every two years is because Maryland law expressly restricts the circumstances under which affiliation decisions can be changed, Md. Code Ann. Elec. Law § 3-303, and provides that a voter "may not be required to register again unless the voter's registration is canceled" for one of the statutorily prescribed reasons set forth in Title 3, Subtitle 5 of the Election Law.  Md. Code Ann., Elec. Law § 3-101(f)(2).  So it is difficult to see how the State could justify the application of the signature-collection requirement here by denigrating its own voter registration data as "stale" when the reason the party affiliations last so long is at least partly because the State wants it that way.  Surely the defendant cannot mean to suggest that it is permissible for the State to treat the registrations of Libertarians, or of small-party voters generally, as less durable than affiliations with larger parties, who are exempt from the signature-collection requirement once they have more than one percent of all registered voters affiliated with them.

Finally, we note that despite the attention the Opposition devotes to the history of ballot access reform in Maryland, and the generous helpings of legislative history material the defendant has supplied, we find no evidence at all to suggest that the legislature ever had either of the Opposition's two imagined justifications in mind.  Indeed, we know of no evidence to suggest that anyone ever thought of this problem until the Libertarian Party found itself in this position.  As we have said many times, the signature-collection requirement is not the iron grip of totalitarianism nor is it the product of a malevolent will; it simply makes no sense whatsoever to apply the requirement in our situation.

**II.     The Plaintiffs Are Likely to Suffer Irreparable Injury Unless this Court Grants Preliminary Injunctive Relief.**

Disappointingly, the defendant argues that the Libertarian Party would not be irreparably harmed by having its name removed from the party affiliation section of the Voter Registration Application, because the Party could buy a list of all the new voters and mass-mail them.  Opp'n at 31-33.  This would be a bad argument even in the heyday of mass mailings; in 2019, it's ridiculous.

Exhibit A to the Johnston Declaration shows that in the four-year cycle from January 1, 2015, to December 31, 2018, there were on average 295,433.5 new voter registrations per year, or an average of 24,619 per month.  We have offered uncontradicted evidence that roughly one percent of these new registrants choose the Libertarian Party—and of course the one-percent threshold is significant for the Party's long-term status under Maryland Election Law.  Our argument for irreparable harm is that if this litigation (already in its second month) were to last four more months after the Libertarian Party is removed from the VRA, we might lose 1,000 new registered voters (one percent of 100,000) who would otherwise choose to affiliate with the Libertarian Party.  Of course, if we lose in this Court and the matter goes up on appeal, then the number of new registered voters *lost* might grow three- or four-fold.

The defendant's response is apparently that we have an adequate remedy in our ability to send a mass mailing to all of the new voters later—100,000 of them for a four-month litigation; 400,000 of them for a four-month litigation in this Court and a twelve-month appeal.  If the defendant really wishes to persist in the claim that mass-mailing 400,000 Maryland voters and hoping they'll respond is an adequate substitute for being in front of the voter's eyes when they are already thinking about their party affiliation, we hereby request that they bring a witness to the hearing who can be examined on this point.

15

### III.    The Balance of Equities Favors the Plaintiffs.

The only potential harm cited by the defendant is that granting us relief "could give rise to requests for similar treatment by other similarly (and potentially not-so-similarly) situated parties." Opp'n at 33. What the defendant does not say, however, is that we have very explicitly based our claim on the fact that we have 22,464 registered voters; no other political organization in Maryland (other than the Democrats and Republicans) has as many as 10,000. In short, while the Maryland Green Party is close to 10,000, there currently are no similarly situated political parties in Maryland.

In addition, if we get injunctive relief, it will be because our our constitutional rights demand it, or at least preliminarily are more likely than not to demand it. If there are other requests for relief from other parties whose constitutional rights require similar treatment, the defendant should welcome the opportunity to restore them to their rights. The defendant's "burden" of having to obey the Constitution is not a hardship that balances out the plaintiffs' interest in having their constitutional rights respected.

It also remains true, as it was when we filed our motion, that it will be literally 100 times harder to correct an early error in the State's favor by using the State's suggested mass mailing than it would be to correct the opposite error by doing the same mailing only to the one voter in 100 who is likely to register as a Libertarian during the pendency of the litigation.

### IV.    Preliminary Injunctive Relief Is in the Public Interest.

The defendant makes a rather puzzling argument that the temporary injunctive relief we request would disserve the public interest because it would "mislead thousands of voters with regard to the recognition status under State law of the Party." Opp'n at 34. But the Voter Registration Application already lists not only all the recognized parties but also "Unaffiliated"

and "Other," with a blank for the voter to fill in the name of some party not listed.  Neither "Unaffiliated" nor "Other" is, of course, a recognized party, so the defendant's argument seems to prove too much.  We know of no law that would prevent the State from listing some of the most common choices for "other" by name instead of simply leaving a blank.

In addition, we note that COMAR 33.05.03.07 requires revision of the VRA "as soon as practicable."  It seems to us to be well within the defendant's authority to determine that it is practicable to add a new party at this time, but it is not yet practicable to remove a party with whom the Administrator of the Board of Elections is in pending litigation, particularly when that litigation can with diligence and cooperation be resolved by May.  It would be far better for the public as well as the parties if we could get on with that and preserve the status quo in the meantime.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs ask this Court to enter a preliminary injunction as soon as possible, preventing the defendant from implementing any change to the Voter Registration Application (or parallel forms or processes of voter registration or party affiliation) that would exclude the Libertarian Party as one of the listed options for party affiliation.  A [Proposed] Preliminary Injunction was filed with the Court on January 22.

Respectfully submitted,

/s/ Mark A. Grannis
Mark A. Grannis (Bar No. 19552)
Mark D. Davis (Bar No. 19543)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
mgrannis@hwglaw.com
mdavis@hwglaw.com
*Counsel for Plaintiffs*

17

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2019, I caused a copy of the foregoing to be served electronically upon the following:

Andrea William Trento
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
atrento@oag.state.md.us

/s/ Mark A. Grannis
Mark A. Grannis (Bar No. 19552)