# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Robert S. JOHNSTON III and the
LIBERTARIAN PARTY OF MARYLAND

     Plaintiffs,

v.

Linda H. LAMONE, in Her Official
Capacity as Administrator of the
Maryland State Board of Elections

     Defendant.

Case No. 1:18-cv-03988-CCB

## PLAINTIFFS' OPPOSITION TO
## MOTION TO DISMISS

Mark A. Grannis (Bar No. 19552)
Mark D. Davis (Bar No. 19543)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
mgrannis@hwglaw.com
mdavis@hwglaw.com

March 11, 2019

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 3

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ....................................................................................................................... 6

I.     The Complaint Adequately Alleges an Unconstitutional Burden on the Plaintiffs' Rights Under the First and Fourteenth Amendments. .......................................... 6

       A.     The Complaint Adequately Alleges Both the Burden on the Plaintiffs' Constitutional Rights and the Absence of Any Sufficiently Weighty State Interest to Justify the Burden. ................................................................................. 8

       B.     The "Plausibility" Requirement of *Iqbal* Does Not Authorize a Quickie Summary Judgment Motion Before Answer or Discovery.................................. 13

II.    The Plaintiffs' Claims Regarding Maryland's "Name Standard" for Signature Validation Are Ripe for Adjudication................................................................... 19

CONCLUSION.................................................................................................................... 22

## INTRODUCTION

The defendant's motion to dismiss attempts to twist Rule 12(b)(6) into a "quick and dirty" summary judgment procedure.  The defendant does not dispute that the causes of action alleged in the complaint exist, nor does she argue that the plaintiff has failed to allege any required element of either cause of action.  Rather, she asks the Court to make a factual determination before discovery has even begun—namely to weigh the burdens imposed on the plaintiffs against their benefit to the State.  But of course, the level of burden imposed on the plaintiff and whether those burdens further a legitimate state interest are highly disputed and will be the subject of discovery.

Such a fact-intensive inquiry is completely misplaced at this stage.  With apologies for beginning in so elementary a fashion, we quote from the introduction to a leading commentary on the rule:

> Rule 12(b)(6) motions test whether the pleaders accomplished what they were
> obligated to do under the federal pleading rules (Rules 8 and 9).  A claim will fail
> this inspection if it asserts a legal theory that is not cognizable as a matter of law
> or if the factual tale it alleges is ruled to be implausible.

Steven Baicker-McKee, et al., *Federal Civil Rules Handbook* 458 (26th ed. 2019).  The obligation of the pleader at this point is not to win the whole case by establishing the predicate facts, or even to forecast the evidence that will emerge from the discovery process, but only to submit a short and plain statement of some legally cognizable claim so that the case can proceed with the full awareness of all parties and the court about precisely which issues are to be contested.

The Office of the Attorney General knows this, which is what makes the defendant's motion so disappointing.  In this case, the complaint is very specific and the defendant has already contested the specific factual allegations underlying Count One in the context of our

motion for preliminary injunctive relief.  Tellingly, the defendant did *not* argue there that she could win even if all our facts were true—the quintessential element of any meritorious 12(b)(6) motion.  Instead, as the Court may remember, the defendant *submitted documentary evidence and proffered a witness* in order to *contest the facts alleged*.  That, we submit, was an honest response, albeit one with which we disagreed.  To claim now that there is no *need* to answer our factual allegations because they *fail to state a claim for relief* is at best unconvincing in light of that history.

The contradiction at the heart of the defendant's motion becomes all the more jarring as the defendant spends page after page arguing that this Court and the Fourth Circuit have previously rejected arguments like ours on the merits.  We like some precedents more than others, of course, but wherever an argument even remotely like ours has lost, it has lost *on the merits*.  Most notably, the defendant's two favorite cases were both decided after the parties submitted joint stipulations of fact and motions for summary judgment.  *Mathers v. Morris*, 515 F. Supp. 931, 932 (D. Md.), *aff'd*, 649 F.2d 280 (4th Cir.), *aff'd*, 454 U.S. 934 (1981); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995).  *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014), was also decided on summary judgment, not on a motion to dismiss.  We need hardly say that we do not agree that our case is just like *Mathers* or *McLaughlin* or *Pisano* or any other case cited by the defendant; we think it much more like the Supreme Court's decisions in *Bullock v. Carter*, 405 U.S. 134 (1972); *Lubin v. Panish*, 415 U.S. 709 (1974); *Illinois v. Socialist Workers Party*, 440 U.S. 173 (1979); and *Norman v. Reed*, 502 U.S. 279 (1992).  But regardless of which precedents the Court ultimately finds more instructive, there is no question that our allegations *do* state a legally cognizable claim for relief, one that has in fact been recognized many times in many courts over the past fifty years.

This unmeritorious motion to dismiss is no more frivolous than many others, and sadly some of the frivolous motions get granted from time to time.  It is above our pay grade to try to alter the incentives that lead good lawyers to file bad motions.  All we ask here is for this Court to deny this particular bad motion as quickly as possible and order the defendant to answer within ten business days.

## STANDARD OF REVIEW

This Court recently set forth the applicable standard as follows:

> When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations and alterations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim ... However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (quotations and citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955).

*Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 448-49 (D. Md. 2013), *aff'd*, 546 F. App'x 165 (4th Cir. 2013).

"Rule 12(b)(6) 'does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 545

(4th Cir. 2013) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).  "Courts must be careful, then, not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015) (citing *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).  "Similarly, courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage."  *Id.*

## ARGUMENT

### I.     The Complaint Adequately Alleges an Unconstitutional Burden on the Plaintiffs' Rights Under the First and Fourteenth Amendments.

The plaintiffs in this case have alleged two distinct constitutional claims.  Count One concerns what we shall refer to as the "Signature Collection Requirement" of state law: Maryland requires the plaintiffs to collect 10,000 petition signatures, ostensibly for the purpose of demonstrating popular support for the party's continued recognition.  The plaintiffs allege that the Signature Collection Requirement cannot constitutionally be applied to the Libertarian Party of Maryland because it would require them to waste resources on a pointless bit of bureaucratic busywork.  Because there are already more than 22,000 Libertarians registered with the State, and because the 10,000 signatures we would collect would almost necessarily come overwhelmingly from non-Libertarians, the plaintiffs allege that collecting the signatures would would tell the State nothing new, and indeed far less than it already knows.  The primary and perhaps the only effect would be to drain the Libertarian Party's coffers.  We therefore allege that it is unconstitutional for the State to burden a small party like the Libertarians with this requirement on the facts presented here.

Count Two concerns what we shall refer to as the "Signature Validation Rules" under state law.  We allege—based on our own prior experience—that Maryland uses the Signature

Validation Rules not merely to invalidate the signatures of ineligible signers (such as people who are not registered to vote), but also to invalidate the signatures of a significant percentage of registered voters whom the State has *actually identified*—unless the signers write their names in the way prescribed by the State.  We also allege that Maryland disqualifies signatures *known* to be from eligible voters as "duplicates" even when no earlier signature has been counted.  We allege that no valid state interest is served by either application of the Signature Validation Rules, and therefore it is unconstitutional for the State to use the Signature Validation Rules to disenfranchise people whom the State has actually identified as registered voters.

The unifying theme is that in both cases we are challenging specific instances of feigned ignorance by the State.  With respect to the Signature Collection Requirement, the State knows from its own records that the support for the Libertarian Party within Maryland exceeds the 10,000-voter threshold; but the State pretends not to know this, and the pretense of ignorance imposes a severe burden upon the plaintiffs' rights without any sufficiently weighty countervailing public benefit.  With respect to the Signature Validation Rules, the State knows from its own records that a large percentage of the signatures it invalidates in any petition drive belong to registered voters whom the State has actually identified; but the State pretends not to know this, and the pretense of ignorance imposes a severe burden upon the plaintiffs' rights without any sufficiently weighty countervailing public benefit.

The governing case law makes clear that a cognizable claim challenging the constitutionality of the Signature Collection Requirement and the Signature Validation Rules depends on two central elements—the gravity of the burden imposed on the plaintiffs' rights, and the speciousness of the justification offered by the defendant.  In the formulation that has already been quoted many times in this case:

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury" . . . against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

The Complaint sets forth "the character and magnitude of the asserted injury" very clearly, and alleges with some specificity exactly why the State's recognized interests in this area are insufficient to justify the burdens imposed.  Although the defendant has not yet answered, the defendant *has* already contested the factual allegations in the context of our motion for preliminary injunctive relief.  It is already clear, therefore, that there will be conflicting evidence about both the gravity of the burden and the speciousness of the justifications.  The parties have agreed to create a joint stipulation of fact to narrow and refine the factual disputes to facilitate the eventual resolution of these issues on summary judgment.  But that is all for another day. Rule 12(b)(6) tests the *sufficiency of the complaint* only, so the fact that the plaintiffs have plausibly alleged a significant burden on their constitutional rights that is unjustified by any compelling or important state interest should be the end of the matter.

A.      **The Complaint Adequately Alleges Both the Burden on the Plaintiffs' Constitutional Rights and the Absence of Any Sufficiently Weighty State Interest to Justify the Burden.**

The Complaint alleges—and indeed, there can be no real dispute about it—that the plaintiffs' future participation in Maryland elections depends upon the continued recognition of the Libertarian Party as a "recognized" political party.  Compl. ¶ 8.  A party, once recognized, can remain "recognized" either by nominating a presidential or gubernatorial candidate who receives at least one percent of the total vote for that office, or by attracting the party affiliations

8

of at least one percent of all registered voters (currently approximately 40,000).  Compl. ¶ 10.

The Libertarian Party of Maryland enjoyed the affiliations of approximately 22,000 voters when

the Complaint was filed, and its most recent nominee for governor won less than one percent of

the vote in the most recent election, so under state law the Libertarian Party will not be permitted

to nominate candidates in any future elections unless it collects the signatures of 10,000

registered voters (the "Signature Collection Requirement").  Compl. ¶¶ 1, 10-12.

Furthermore, all signatures collected will be "validated" (or invalidated) according to

statutory and administrative standards that minutely prescribe how voters must print and sign

their own names (the "Signature Validation Rules").  Unsurprisingly, the Signature Validation

Rules lead to the invalidation of many signatures from voters who are ineligible to sign party

recognition petitions, Compl. ¶ 20, and the plaintiffs do not challenge the application of the

Signature Validation Rules in that context.  But the Complaint also alleges that the State Board

of Elections applies the Signature Validation Rules so as to invalidate thousands of signatures for

"name-related defects" even after the Board officially determines that the signature in question

came from a registered voter who was eligible to sign the petition.  Compl. ¶ 21.  And this was

not an "implausible" allegation; the allegations of our Complaint refer specifically to historical

experience with the Signature Validation Rules in 2011.

At the time the Complaint was filed, the most obvious and immediate burden on the

plaintiffs' rights was the time and expense of complying with the Signature Collection

Requirement.  Although the Election Law on its face requires small parties (but not larger ones)

to file a new party recognition petition signed by at least 10,000 registered voters, we have

specifically alleged that the Signature Collection Requirement is significantly more onerous in

practice.  Paragraphs 20 through 27 of the Complaint use specific historical information from

past petitions in order to show why the facial requirement of 10,000 signatures significantly understates the burden imposed by the signature collection requirement and the signature validation rules.  Of special significance are paragraphs 20, 21, 26, and 29, which cite historical experience with the challenged rules to show why a prudent party in the plaintiffs' position would plan to collect approximately 25,000 signatures rather than 10,000.  Paragraphs 14 and 17 of the Complaint use the plaintiffs' own experience to attempt to quantify the burden of the two challenged features of state law in terms of time (¶ 14) and money (¶ 17).  Paragraph 27 of the Complaint uses the per-signature cost (¶ 17) and the realistic estimate of signatures required (¶ 26) to derive a total monetary burden of between $65,000 and $110,000–an amount many times larger than the electoral burdens struck down by the U.S. Supreme Court in *Bullock v. Carter*, for example, 405 U.S. at 135-136,144; and *tens of thousands* of times larger than the electoral burden struck down in *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 668 (1966).[1]

The defendant had agreed to maintain the status quo during the pendency of the litigation by permitting the Libertarian Party to remain on the State's Voter Registration Application (and therefore continue to attract new voter affiliations).  After we filed our Complaint, however, the defendant removed the Libertarian Party of Maryland from the State's Voter Registration Application, so that voters will no longer see the LP as an option when they register for the first time or update their existing registrations.  At the hearing on our motion for preliminary injunctive relief on this point, there was sharp debate about whether the resulting harm to us would be "irreparable," but we trust there is no dispute that it constitutes harm, and therefore a

---

[1]   The defendant attempts to get around these specific factual allegations of financial burden by arguing that the plaintiffs need not use professional circulators, but using volunteers does not make the burden go away; it just converts it from dollars to hours.  Paragraph 14 of the Complaint allows one to use the same basic math to derive an estimated burden of 3,750 hours.

new burden on the plaintiffs' rights as a result of the defendant's insistence on applying the

Signature Collection Requirement to the plaintiffs even though it makes no sense in our

circumstances.

The Complaint alleges further that neither the Signature Collection Requirement nor the

Signature Validation Rules can possibly be justified in our case *as a factual matter*.  The

Signature Collection Requirement has always been understood as a method of ensuring that the

party enjoys a "significant modicum of support" within the state, *see Jenness v. Fortson*, 403

U.S. 431, 442 (1971).  But our Complaint alleges that "because the signatures come largely from

random passers-by, approximately 99.5% of who are not (yet) Libertarians, the vast majority of

signatures on any successful ballot access petition by the Libertarian Party are from Democrats,

Republicans, unaffiliated voters, and even a few (very sympathetic) Greens."  Compl. ¶ 15.

Thus, *on the facts of our case,* requiring a party with more than 22,000 registered members to go

out and collect 10,000 signatures "tells the State almost nothing about the level of support

Libertarians currently enjoy within Maryland" (Compl. ¶ 16) and "yields almost no information

of any value about the level of support within Maryland for the Libertarian Party" (Compl. ¶ 18).

We allege that the information already contained in the voter registration files of the State's

22,000 Libertarians provides "both a more informative and a more reliable gauge of support for

the Libertarian Party than the signatures of 10,000 registered voters who may not be Libertarians

but who shop at Safeway."  Compl. ¶ 19.

We have alleged that the Signature Collection Requirement is completely pointless,

which is bad enough; but the Signature Validation Rules actually disenfranchise signatures from

voters whom the State has identified.  The Signature Validation Rules have always been

understood and justified in terms of the State's legitimate interest in preventing fraud and

ensuring that only registered voters sign party recognition petitions.  For example, both of the

principal cases cited by the defendant to justify these rules use the anti-fraud justification.  *See*

*Kendall v. Balcerzak* , 650 F.3d 515, 526 (4th Cir. 2011) ("the signature requirement is

reasonably related to the purpose of detecting fraudulent or otherwise improper signatures" and

"helps to make sure that false signatures are not put on the petition and that unregistered or

ineligible voters do not sign it")[2]; *Burruss v. Bd. of Cty. Comm'rs*, 46 A.3d 1182, 1202 (Md.

2012) ("reasonable means by which the Board can attempt to prevent fraud in petition signing

and efficiently identify and validate the signers").  But the anti-fraud justification completely

fails to meet the allegations of our Complaint, because our Complaint expressly confines itself to

cases in which the State *actually knows* the identity of the signer and *knows* that the signer is a

registered voter.  Compl. ¶¶ 38-40; *see also* Complaint preamble, at 2; Compl. ¶¶ 21, 28-31.  The

question posed by our challenge is *not* whether Maryland can require people to write their

middle initials in order to make it easier to identify the signers; it is whether Maryland can

*actually identify* the signers without their middle initials but refuse to count their otherwise valid

signatures anyway on that technicality.  We concede that there is an important state interest in

identifying all signers, but where the signers have already been identified, we allege that there

---

[2]   It is important to note in connection with *Kendall* that it considered the Signature Validation
Rules only in the context of a county referendum petition, and the court repeatedly stated that
the challenge did not implicate the right to vote.  *See, e.g.*, 650 F.3d at 522 ("there is no
fundamental right to initiate legislation as there is a fundamental right to vote"); 650 F.3d at
523 ("[t]his case is not a right to vote case."); 650 F.3d at 524 ("this case does not implicate
the right to vote").  There was also no suggestion in *Kendall* that the authorities were
attempting to rely on an anti-fraud rationale for disqualifying signatures they themselves had
determined were not fraudulent.

cannot possibly be a state interest of constitutional stature in requiring middle initials for the sake of requiring middle initials.[3]

Rule 12(b)(6) tests the sufficiency of the complaint only.  The fact that the plaintiffs have plausibly alleged a significant burden on their constitutional rights that is unjustified by any compelling or important state interest should be the end of the matter.  Indeed, the defendant really does not argue that there was ever anything in particular *missing* from our Complaint.  She just wants the Court to dismiss it.

### B.   The "Plausibility" Requirement of *Iqbal* Does Not Authorize a Quickie Summary Judgment Motion Before Answer or Discovery.

If there is one thing every lawyer knows about Rule 12(b)(6), it is that the substantive factual allegations of the Complaint must be accepted as true.  Tellingly, the defendant has not been content to abide by that constraint while advancing this motion.  Instead, the defendant has resorted to two strategies from the summary judgment context that are totally out of place here: contradicting the factual allegations, and inviting the court to weigh probabilities.  This Court should reject the defendant's invitation to muddle Rule 12(b)(6) with Rule 56.

The defendant's tendency to contradict our factual allegations is on display wherever the defendant attempts to address the constitutional burdens we have plainly alleged.  For example, the defendant trivializes our estimated costs of signature collection as "incidental," and argues that we need not use professional circulators to collect the signatures—as if that could make the

---

[3]   We refer in the text only to middle initials, as described in paragraphs 22, 25, and 30 of the Complaint.  The argument applies as well to the other name-related defects described in paragraphs 21-31 of the Complaint, such as nicknames (Jimmy Carter), abbreviations (Geo. Washington), and unused first names (Woodrow Wilson).  It also applies to the refusal to count "duplicate" signatures for which no valid "first signature" was ever counted, Compl. ¶¶ 28-29.

burden go away.  Def's Mem. in Supp. of Mot. to Dismiss ("Mem.") at 13, Dkt. No. 22.  As we have noted already, using volunteers rather than professional circulators does not diminish the burden; it only converts it from dollars to hours—approximately 3,750 hours.  To put that in perspective, if the Libertarian Party decided to recruit volunteers to give up two weeks of their vacations and collect signatures in grocery-store parking lots instead, it would take approximately 47 vacation-forfeiting Libertarians working forty hours per week for two weeks to get the job done.  That's not impossible, but it is a very severe burden and under Maryland law it is a burden borne only by small parties.  The defendant quotes speculative *dicta* from other cases about the power of social media to ease this task and so on (Mem. at 14)—none of it having anything to do with our case and most of it almost certainly authored by people who have never collected petition signatures in grocery-store parking lots.  The defendant is entitled to make all of these arguments, but she must make them on summary judgment after both parties have had the benefit of discovery, not on a Rule 12(b)(6) motion before an answer has been filed, before we even know which facts are admitted.

Similarly, the defendant disputes our robustly sourced factual allegations regarding how many signatures we must collect, arguing that we over-estimate the number that could be invalidated for name-related reasons.  *See, e.g.,* Mem. at 28-29.  But whether we should expect an invalidation rate of sixty percent, as we formally alleged based on our own experience (Compl. ¶ 27), or perhaps only thirty percent, as the defendant suggested in connection with the motion for preliminary injunction (Def.'s Opp'n to Mot. for TRO or Prelim. Inj. at 20) is not currently before the Court.  What matters for purposes of this motion is that *the Complaint adequately alleges* specific burdens on the plaintiffs' constitutional rights, and alleges further that burdening us with the challenged features of state law would not, as a factual matter,

advance the state's interests in gauging support for the party or in preventing fraudulent signatures. The defendant is perfectly entitled to dispute the allegations later, but such disputes have no place in the instant motion.

The defendant has also injected new allegations (or arguments, really, because the answer has not yet been filed), as she has every right to do. Chief among these is the suggestion invented by counsel for the defendant (and unknown in either statute or case law as far as we can tell) that the state interest served by the Signature Collection Requirement is not just the demonstration of popular support, but the demonstration of *recent* popular support. *See* Mem. at 19. But this inventive response raises a number of questions on which the parties need to develop an evidentiary record. Where can we find evidence that this is actually a state interest rather than just a clever lawyer's argument? How important can it be if it will cease to be a policy consideration once the Libertarian Party attracts 18,000 more registered voters? Is there any evidence that this alleged state interest has been applied in a non-discriminatory way to other participants in Maryland elections? Is there, for example, any systematic test of recency that applies to the Republicans or the Democrats? Or is the Libertarian Party of Maryland the one and only organization that has ever had a level of support that is indisputably higher than 10,000 registered voters devalued in importance with the observation that not all of those supporters signed on in the last two years? We look forward to learning more about all of these questions,[4] but a Rule 12(b)(6) motion is not the right occasion.

---

[4]   By contrast, we see little reason to spend any time thinking about "two-tier election systems," despite the defendant's insistence that our challenge is focused on them. For the last time, we do not care whether Maryland's election system has one tier, two tiers, or ten tiers; our challenges are focused on the State's attempt to force us to waste our *extremely scarce* resources collecting information the State already has. The defendant's preoccupation with two-tier election systems seems to be a mere vehicle for the citation of previous cases (like

The defendant's tendency to urge the Court to prematurely weigh probabilities on the merits is on display from the very first page of the Memorandum in support of the motion, as the defendant wastes no time in reminding that the Court that our challenge to the Signature Collection Requirement is one "which the Court has already found unlikely to succeed." Mem. at 1.[5]  In keeping with this early invocation of a very different judicial standard than the one that applies to Rule 12(b)(6), the defendant invites the Court to rush ahead *now* to balance the burdens of which we complain against the justifications offered by the defendant, and to resolve the matter in a sort of "quickie" summary judgment.  The case law shows clearly why the Court should absolutely decline that invitation.

In *SD3, LLC v. Black & Decker (U.S.) Inc.*, the Fourth Circuit considered an appeal from the 12(b)(6) dismissal of an antitrust case alleging a group boycott—precisely the kind of allegation in which *Twombly/Iqbal* concerns about "plausibility" are most serious.  Nonetheless, the Fourth Circuit reversed the trial court's dismissal and delivered a sustained and insightful discussion of how courts should assess the sufficiency of factual allegations under Rule 12(b)(6).  "Importantly," the court emphasized, *Twombly* "does not impose a probability standard at the motion-to-dismiss stage."  801 F.3d at 425 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Courts must be careful, then, not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard. . . . When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the

---

*Mathers* and *McLaughlin*) that could not possibly have considered our challenges because neither the facts nor the law on which our challenges are based had yet come into existence.

[5]   *Cf. SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 434 (4th Cir. 2015) ("At this point, [the plaintiff's] prospects for success are largely irrelevant, as '[a] lawsuit need not be meritorious to proceed past the motion-to-dismiss stage.'" (quoting *Ringgold-Lockhart v. Cty. of Los Angeles*, 761 F.3d 1057, 1066 (9th Cir. 2014))).

complaint." *Id.* (citations omitted).  Such weighing "is not [the court's] task at the motion-to-

dismiss stage. . . . [A]ppellate courts have often been called upon to correct district courts that

mistakenly engaged in this sort of premature weighing exercise in antitrust cases." *Id.*  The *SD3*

court criticized the district court for "confus[ing] the motion-to-dismiss standard with the

standard for summary judgment," and "appl[ying] a standard much closer to probability than

plausibility." *Id.* at 426.  Consequently, the Fourth Circuit reversed the trial court's dismissal:

"To dismiss [the plaintiff's] complaint because of some initial skepticism would be to mistakenly

'collapse discovery, summary judgment[,] and trial into the pleading stages of a case.'" *Id.* at

434 (quoting *Petro-Hunt, LLC v. United States*, 90 Fed. Cl. 51, 71 (2009)).

   *SD3* was an antitrust case, but *Colon Health Centers of America, LLC v. Hazel*, 733 F.3d

535 (4th Cir. 2013), illustrates the correct approach when dealing with a broad constitutional

balancing test like the one at issue in our case.  In *Colon Health Centers*, the plaintiffs were

medical providers from outside Virginia, who alleged that Virginia's regulatory requirements for

a "certificate of need" discriminated against out-of-state interests and violated the plaintiffs'

rights under the dormant commerce clause.  733 F.3d at 540-42.  They raised two distinct claims

of unconstitutional treatment, one of which required an allegation of discriminatory purpose or

effect and the other of which required an allegation of "undue burden" on interstate commerce.

Judge Hilton in the Eastern District of Virginia dismissed the complaint under Rule 12(b)(6), but

the Fourth Circuit faulted him for neglecting the "fact-intensive quality of the substantive

inquiry." *Id.* at 545.  In pleading their "undue burden" challenge under the dormant commerce

clause, the *Hazel* plaintiffs had alleged "that Virginia's certificate-of-need program 'does not

actually achieve any legitimate local benefits,'" while "substantially burden[ing] the interstate

market for both medical devices and services," *id.* at 545-46 (internal citation omitted),

allegations quite similar to those the defendant wishes to sweep away in our case.  There were

other similarities as well:  the court noted that the plaintiffs' contentions found "some support in

the case law," that there were only a small number of other states with laws as onerous, and that

"the state's political process cannot be relied upon to rectify" the unfair discrimination because

the plaintiffs lacked political power within the state.  *Id.* at 546.  Under these circumstances, the

*Hazel* court declared the constitutional balancing inquiry—a question of law—to be "fact-

bound" to a degree that prevented resolution on a motion to dismiss.  *Id.* (citing *Pike v. Bruce

Church, Inc.*, 397 U.S. 137, 142 (1970)).  "We shall not attempt to forecast what further

investigation may demonstrate.  The fact-intensive character of this inquiry, however, counsels

against a premature dismissal. . . . This particular challenge too presents issues of fact that cannot

be properly resolved on a motion to dismiss."  *Id.*

We will likewise not attempt to forecast what further investigation may demonstrate in

our case, but the defendant herself has already raised disputes of fact regarding the costs of

compliance with the challenged features of state law, and ultimately the severity of the burden

imposed on the plaintiffs' constitutional rights.  The defendant has also suggested that the State

Board's data on party affiliation may be *less* informative about current voter sentiment than a

collection of 10,000 signatures would be; that claim is testable and we are entitled to test it

before the Court accepts it.  Even the claim that petition signatures are more recent than voter

affiliations is an empirical claim that is subject to confirmation or disconfirmation through the

discovery process.  The defendant has also referred liberally to the experience of minor parties in

Maryland as a kind of success story that shows how reasonable state law is on ballot access; we

think the record is far more mixed and in particular we question how strong the need for any of

the asserted state interests actually is.  Thus, even if Rule 12(b)(6) permitted courts to weigh the

evidence as they sometimes do on motions for summary judgment, the fact is that the proceedings in our case have not yet advanced to the point of generating must evidence to weigh. This motion should be denied, and the defendant should be instructed to answer within ten business days so that the parties can continue to resolve this dispute along the streamlined track we previously negotiated with the defendant.

## II.     The Plaintiffs' Claims Regarding Maryland's "Name Standard" for Signature Validation Are Ripe for Adjudication.

In addition to challenging the sufficiency of the Complaint as to Count Two, the defendant claims that the issue is not ripe. This takes *chutzpah*, because (a) the Libertarian Party of Maryland has already lost its official recognition; (b) the defendant has recently reneged on the parties' informal standstill agreement and has removed the Libertarian Party of Maryland from the statewide Voter Registration Application; and (c) the plaintiffs have invoked the Declaratory Judgment Act, 28 U.S.C.A. § 2201, for the express purpose of guiding their efforts to comply with the Signature Collection Requirement and the Signature Validation Rules that the defendant insists on enforcing against them. Despite the *chutzpah*, the argument is *shlekht*.

"To determine if a case is ripe, [courts must] 'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" *Landsdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). "Although there is no precise list of factors a court should entertain in applying this test, the Court in *Abbott [Labs. v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)] listed several for consideration." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992). In addition, the Fourth Circuit has noted in the ripeness context that "[b]ringing lawsuits on the eve of pending elections disrupts the electoral process,"

19

and that issuing declaratory relief earlier may avoid the common problem of giving the courts too little time to decide last-minute election cases based on an adequate factual record. *Miller v. Brown*, 462 F.3d 312, 320 (4th Cir. 2006).

The defendant argues that our claims are not yet fit for judicial resolution because we do not yet know whether there will be a petition, or whether it will contain 10,000 signatures, or whether "a sufficient number" of those signatures will be rejected for name-related reasons. Mem. at 25.  These arguments are entirely spurious, and ignore the very purpose of the Declaratory Judgment Act.

First, the only way there will not be a petition containing at least 10,000 signatures is if the plaintiffs prevail on Count One of the Complaint.  Counts One and Two are, to that extent, an example of alternative pleading, specifically authorized by Fed. R. Civ. P. 8(d).  But the fact that the Court need not reach Count Two if we prevail on Count One does not render Count Two unripe, or else all alternative pleading would raise ripeness problems.  That is not the law.

Second, the defendant's arguments seem to ignore the very purpose of declaratory relief, which is to clarify and settle the legal relations in question and thereby enable the parties to guide their conduct accordingly.  *See Miller*, 462 F.3d at 317 (declaratory relief on enforceability of open primary law "dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit").  If the plaintiffs are required to circulate a new party petition at all, then they will decide how many signatures they need to submit in order to be on the safe side, so the notion that the plaintiffs might unexpectedly end up with more signatures than they were expecting is well past speculative and very close to impossible.  Nor is there any realistic possibility of the State Board "changing its mind" about the Signature Validation Rules, as there might be in other cases involving administrative action.  Maryland's Court of Appeals

has definitively held that these interpretations are required by statute and has specifically refused to adopt a saving construction to avoid constitutional difficulties. *Md. State Bd. of Elections v. Libertarian Party of Md.*, 44 A.3d 1002, 1020 n.12 (Md. 2012).

The defendant also suggests that there might be some reason to distinguish among the various name-related defects that form part of the Signature Validation Rules challenged in Count Two, but we think this is a misunderstanding of our claim.  Count Two only challenges the Signature Validation Rules insofar as they disqualify a signer whom the State Board has actually identified as a registered voter for name-related reasons.  Compl. ¶¶ 38-40.  We cannot imagine any reason why the constitutionality of such a disqualification could depend on whether it was based on a missing middle initial or the use of "Larry" rather than "Lawrence."

The hardship prong of the ripeness inquiry is measured by the immediacy of the threat and the burden that would be imposed on the plaintiff in the absence of a timely declaration. *Landsdowne on the Potomac*, 713 F.3d at 199 (citing *Charter Fed. Sav. Bank*, 976 F.2d at 208-09).  Here, as in *Miller*, an early declaration of the constitutionality of the Signature Validation Rules is necessary in order to guide the behavior not only of the plaintiffs but of the many other Maryland voters whom they will solicit for signatures.  It is undeniably a hardship to require the plaintiffs to proceed in so large a project without knowing what the standards are or whether as a practical matter they will need 12,500 or 25,000 signatures; that's a material difference.  The defendant's bizarre suggestion of piecemeal litigation—that is, that the plaintiffs should mobilize their professional and volunteer circulators, collect perhaps 15,000 signatures, give it a go with the State Board, and *then* return to court to litigate this issue, and do it all in time to repeat the process if necessary, presumably all before the nomination deadlines for the 2020 elections, is deeply impractical for all concerned, and worst of all for the plaintiffs.

The hardship on the plaintiffs here is magnified by the fact that the Libertarian Party is *currently* unrecognized in Maryland, and it was the defendant's decision to place the plaintiffs in this position by reneging on the informal standstill agreement we negotiated prior to filing.  It is also relevant that plaintiff Libertarian Party of Maryland attempted to raise all of the issues covered by Count Two eight years ago in the litigation that ultimately resulted in the decision by the Maryland Court of Appeals in *Maryland State Board of Elections v. Libertarian Party of Maryland*, 44 A.3d 1002 (Md. 2012).  In that litigation, the LP deferred its constitutional challenge until it had exhausted all possibility of a saving construction of the statute—and by that time the election was too close to permit timely adjudication of the issues.  *See* 44 A.3d at 1016 n.11.  Asking the plaintiffs here to place their constitutional claims on hold until after the next petition, on the merest chance that the State Board might act differently next time either as a reviewer or as a litigant, is like Lucy asking Charlie Brown to run up and kick the football, for real this time.

## CONCLUSION

The defendant's motion to dismiss should be denied in all respects.  The Complaint adequately pleads both causes of action included therein, and Count Two is ripe for declaratory relief.  We therefore ask the Court to deny the motion, order the defendant to answer within ten

business days, and reinstate the scheduling order previously entered by the Court before the filing of the motion to dismiss.

Respectfully submitted,

/s/ Mark A. Grannis
Mark A. Grannis (Bar No. 19552)
Mark D. Davis (Bar No. 19543)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
mgrannis@hwglaw.com
mdavis@hwglaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I caused a copy of the foregoing to be served electronically upon the following:

Andrea William Trento
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
atrento@oag.state.md.us

/s/ Mark A. Grannis
Mark A. Grannis (Bar No. 19552)