IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT S. JOHNSTON, III,
*et al.*,

v.

Civil No. CCB-18-3988

LINDA H. LAMONE, Administrator of
The Maryland State Board of Elections, in Her
official capacity

\*\*\*

**Memorandum**

Political parties in Maryland become officially recognized by submitting the signatures of 10,000 registered voters. To remain recognized, a party must, in each statewide general election, nominate a candidate for president or governor who receives 1% or more of the total vote, or secure the party affiliation of 1% or more of all registered voters. Md. Elec. Law 4-103(a)(2).[1] At

---

[1] Maryland election law dictates that to become a recognized political party, a group must, among other requirements, submit a petition to the State Board of Elections with "the signatures of at least 10,000 registered voters who are eligible to vote in the State . . ." Md. Code Ann., Elec. Law § 4-102(b)(2)(i). Among the privileges afforded to political parties in Maryland is the advantage of being listed on the statewide voter registration application ("VRA"). Once a group attains political party status, a grace period ensues and the party remains on the VRA "until December 31 in the year of the second statewide general election following the party's qualification under § 4-102." Md. Code Ann., Elec. Law § 4-103(a). Critically, a party is subsequently allowed to retain its status:

 (i) if the political party has nominated a candidate for the highest office on the ballot in a statewide general election, and the candidate receives at least 1% of the total vote for that office, the political party shall retain its status through December 31 in the year of the next following general election; or

 (ii) if the State voter registration totals, as of December 31, show that at least 1% of the State's registered voters are affiliated with the political party, the political party shall retain its status until the next following December 31.

1

issue here are the claims by plaintiffs Robert S. Johnston, III and the Libertarian Party of Maryland (the "Party") that: (1) this "two-tiered" ballot protocol is unconstitutional, at least as presently applied to the Party, because over 22,000 Marylanders remain registered as Libertarians, and requiring new signatures would be a costly but gratuitous exercise advancing insufficient state interest; and (2) the state-imposed name requirements for a signature to be valid are needlessly stringent.[2] The Party previously has been recognized in Maryland, including for an uninterrupted stretch between 2012 and 2018. In the 2018 election, however, the Party failed to garner the requisite votes for its gubernatorial candidate, thus relegating it to tier one and requiring the Party to again obtain 10,000 signatures in order to be reinstated as a recognized party. As to the first claim, because the signature requirement imposes only a modest burden on the Party and furthers an important state regulatory interest, Maryland's two-tiered approach is constitutional. The plaintiffs' second claim however, is not yet ripe for review: factual uncertainties remain, and the precise contours of the legal question have yet to be fully detailed. For these reasons, as explained below, the plaintiffs fail to state a cognizable claim and the motion to dismiss filed by defendant Linda H. Lamone, in her official capacity as the administrator of the Maryland State Board of Elections, will be granted.

I.      **Standard of Review**

When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived

---

Md. Code Ann., Elec. Law § 4-103(a)(2). Once a group loses its status as a political party it may "regain that status only by complying with all the requirements for qualifying as a new party under § 4-102 of this subtitle." Md. Code Ann., Elec. Law § 4-103(c). It must, in short, start over.

[2] The plaintiffs previously brought a motion for a temporary restraining order and preliminary injunction to forestall the Party's removal from the Maryland Voter Registration Application. (ECF No. 11.) It was denied. (ECF No. 16.)

2

therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

II. **Discussion**

The plaintiffs levy two as-applied constitutional challenges to Maryland's elections laws, each under the First and Fourteenth amendments; namely, that the signature requalification threshold and the name standard lack the requisite means-end rationality. *Burdick* supplies the applicable constitutional test. "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and

3

Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal quotations omitted). The severity of the burden, in turn, dictates the level of justification required by the state. Severe burdens trigger strict scrutiny: the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. But if the state election statute imposes only a modest burden, the state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *South Car. Green Party v. South Car. State Elections Comm'n*, 612 F.3d 752, 756 (4th Cir. 2010)).

i. 10,000 Signature Requalification Requirement

The heart of the plaintiffs' complaint in this case is that forcing the Party into the exercise of collecting 10,000 new signatures—when more than 22,000 voters remain registered as Party affiliates—appears to the plaintiffs as a gratuitous exercise that provides the state with no newfound information about the Party or its level of support among voters. *See* ECF No. 23 at p. 6. The defendant, by contrast, maintains that the two-tier electoral system (in which barriers to entry are lower than requirements to maintain party status) serves a variety of state interests, including providing a metric of ongoing and contemporaneous political support.

The threshold question is therefore the severity of the burden imposed by § 4-103(c). Both sides appear to agree that the burden at issue is the time and expense of collecting additional signatures. *See* ECF No. 23 at p. 9. The plaintiffs maintain that the signature

4

requirement imposes a significant burden that is unjustified by a state interest. *See id.* at p. 13. They invoke *Bullock*, a case concerning substantial filing fees Texas candidates had to pay in order to seek a political party's nomination, for the proposition that the estimated cost of the signature collection effort here is sufficiently high to require "close[] scrutin[y]." *Bullock v. Carter*, 405 U.S. 134, 143-44 (1972). But this case is readily distinguishable on multiple fronts. Not only is the applicable cost here imposed on a political party and not on an individual candidate, the requirement in no way proves to be "patently exclusionary" to any candidate or political party. *See id.* (explaining that the filing fees required to get on the ballot in Texas were so high that "[m]any potential office seekers lacking both personal wealth and affluent backers [were] in every practical sense precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support"). Here, the signature requirement has not prevented the Party from reacquiring recognition time and again. *Harper v. Virginia State Bd. of Election*, similarly relied on by the plaintiffs to show the severity of their monetary burden, is even farther afield: it involved a poll tax levied against prospective voters themselves. 383 U.S. 663, 668 (1966).

Case law analyzing more onerous recognition requirements confirms that the signature requirement imposed here is merely a modest burden on the Party. In *Mathers v. Morris*, a judge in this District considered a more exacting version of this precise Maryland statute, stating, "[t]he statutory requirement of 10,000 signatures statewide for initial qualification as a political party is a relatively minor restriction and does not unduly burden the rights of those seeking status as a political party." 515 F. Supp. 931, 937 (D. Md. 1981) (*aff'd*, 454 U.S. 934 (1981)). *See also Pisano*, 743 F.3d at 934 (85,739 signatures over three-and-half years considered a modest burden); *American Party of Tex. v. White*, 415 U.S. 767, 783 (1974); *cf. McLaughlin v. N.C. Bd.*

5

*of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995) (statute requiring signatures of 2% of voters for a party to gain ballot access and requiring lead candidate to receive 10% to remain on the ballot "undoubtedly severe[,]" but nevertheless constitutional). Thus, to the extent the plaintiffs assert that strict scrutiny applies or that the magnitude of the burden imposed by the signature requirement is a factual assessment that should be tabled until summary judgment, this argument is squarely foreclosed by precedent. The burden here, as a matter of law, is modest.

The next step in the *Burdick* framework is to pinpoint the state's interest that is advanced by the ballot access law at issue. As the Supreme Court has repeatedly maintained, states have a valid interest in requiring candidates and political parties to show some amount of support before putting them on the ballot. "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Two-tier systems, including the more onerous predecessor in Maryland, serve this established state interest. As the court in *Mathers* reasoned, "The Maryland requirements that a political organization gather 10,000 signatures for initial qualification as a political party and that such a party poll at least three percent of the statewide vote in order to maintain such status obviously serve [a] substantial state interest." 515 F. Supp. at 936. It continued: "The State has a substantial interest in requiring a 'significant modicum of support' of political organizations before they are given status as political parties under the statute. . . . That state interest does not disappear once an organization has complied with some initial threshold requirement, particularly where the initial requirement has been set at a relatively unrestrictive level. This Court knows of no reason why a state cannot enact a two-part statutory scheme so

6

long as the totality of the restrictions imposed serve a substantial state interest and are not unduly burdensome." *Id.* at 937-38.

Because the burden imposed on the Party is modest, the question becomes whether the restrictions are nondiscriminatory and reasonable, and whether they advance important regulatory interests.[3] *Pisano*, 743 F.3d at 933. The crux of the plaintiffs' position is that the signature requirement is a wholly superfluous mandate that provides the state with less information about public support for the Party than if it ran a quick search through its database of registered voters and tallied those already registered as Libertarians. And yet, while the Party's frustration is understandable to the extent that it has had to fulfill repeatedly the requalification requirements, the plaintiffs gloss over the myriad state interests that are advanced by the two-tier system as applied to the Party that would not be furthered by tallying those already registered.

First, the two-tiered system encourages a diversity of political options by imposing a relatively modest barrier to entry, but then installing an exit ramp for political parties that fail to win or maintain voter support. Quoting the district court, the Fourth Circuit explained in *McLaughlin* that "the lower ballot access requirement actually gives a group a chance to prove itself when it otherwise would be kept off the ballot. It is an inclusive, not an exclusive policy—a *safety valve-promoting political participancy while protecting the ballot.* . . . It is not unfair to expect a party to improve its showing of support from the petition process to be accorded automatic ballot access." *McLaughlin*, 65 F.3d at 1222 (emphasis supplied).[4] While the plaintiffs

---

[3] In fact, for the same reasons that follow, it is likely that the two-tiered system is sufficiently tailored to advance a state interest of compelling importance, such that it would survive even if strict scrutiny were applied. *See McLaughlin*, 65 F.3d at 1221.

[4] The Fourth Circuit continued: "Indeed, we previously have upheld two-tier ballot access schemes that require a party to exhibit a greater showing of support to remain on the ballot than that party needed to place a candidate in the first place and that are roughly comparable in magnitude to the tiers that North

7

are careful not to ask this court to rewrite the Maryland statute—indeed they object only to the application of the two-tiered system to their own requalification effort—granting relief would require just that. The plaintiffs do not propose an alternative, and none would be appropriate for this court to impose. The current formulation has sufficient means-end rationality to withstand the plaintiffs' constitutional challenge. *Burdick*, 504 U.S. at 434.

Second, party affiliation on the voter registration materials and new party petition forms ask potential signers different questions for different purposes, such that it cannot be inferred that a voter who signed one form would necessarily sign the other. There may be a group of people willing to register with the Party who would not sign the petition. Perhaps they seek only to join an established or recognized political party. Perhaps they want to vote in a particular primary; indeed, the VRA explains: "You must register with a political party if you want to take part in the political party's primary, caucus or convention." Md. Code Ann., Elec. Law § 3-202(a)(4). Or perhaps a voter would register with the Party for an interim period while she campaigned for the recognition of a Libertarian party rival. Equally, there may be a group of citizens, perhaps those who merely favored political diversity, who would sign a new party petition but who would not register with the Party. One simply cannot assume a coterminous population.

Third, and most critically, the signature requirement has a temporal axis. While signatures must have been collected in the two-year period before submission, party registrations may have occurred long ago. There has been no contention by either party that the state of Maryland systematically culls its databases for expired registrations, nor necessarily removes

---

Carolina has established. *See Libertarian Party of Virginia v. Davis*, 766 F.2d 865 (4th Cir.1985) (.5% access requirement for statewide office, 10% retention); *Socialist Workers Party v. Hechler*, 696 F.Supp. 190 (S.D.W.Va.1988), *aff'd in part*, 890 F.2d 1303 (4th Cir.1989), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990) (1% access, 10% retention)." *McLaughlin*, 65 F.3d at 1222-23.

8

registered voters when they move out of state, or even when they are recently deceased. More importantly, because a voter's political affiliation remains until affirmatively changed, there may be general election voters who affiliated with a particular party years ago, but whose political persuasions have since evolved. They may well be included in the current pool of 22,000 Party registrants. To put it simply, the signature requirement is a gauge of contemporaneous support, while the tally of party affiliations provides information which may well be outdated.

For these reasons, the two-tiered system as applied to the Party advances what is at least an important regulatory interest. It is reasonable that Maryland does not treat party affiliations as equivalent to new party petition signatures. And there is no defensible allegation that the signature requirement is discriminatory, beyond the circular contention that it disproportionately applies to smaller political parties. The signature requirement as applied to the Party is constitutional.

ii. Name Standard

In addition to challenging the new signature requirement, the plaintiffs bring a second constitutional challenge, this time contending that the "name standard" for a valid petition signature (which requires a petition signature to match the statewide voter registration list) is unconstitutional as applied to Party petitions to the extent that the state invalidates names despite matching them to the voter registrations rolls and otherwise using the signature's accompanying information to, among other things, update voter information. Md. Code Ann., Elec. Law § 6-203. The plaintiffs contend that "validation standards virtually guarantee the invalidation of many signatures that the State Board of Elections definitely identifies as having come from particular registered voters." Compl. ¶ 21. They marshal the Party's experience in 2011, pleading

9

that the "State Board of Elections itself conceded that the Libertarian Party's petition contained the signatures of more than 12,000 registered voters whom the State itself identified by name; the State even altered each signer's official registration file to note that he or she had signed the petition and relied on those signatures for other purposes, such as updating the voter's address and determining whether the voter was active. But the State Board nonetheless ultimately found over 6,000 of those signatures to be invalid because of one or more name-related defects." *Id.*[5] The defendant contends that this claim is not ripe and is otherwise non-meritorious.

*A. Ripeness*

The defendant argues that the name standard question is not ripe for review. The claim here, they note, is predicated on the Party's experience in 2011 and it is uncertain whether the Party will submit a petition this election cycle, whether it will submit more than 10,000 signatures, or whether it will otherwise fail to meet the 10,000 signature threshold. *See* ECF No. 22-1 at 32. They also note that state courts have clarified how the name standard is to be applied in the wake of the 2011 petition and future signature invalidations are likely to be more predictable. *Id.*; *see also Md. State Bd. of Elections v. Libertarian Party of Md.*, 426 Md. 488 (2012). The plaintiffs note that they have already been taken off the voter registration materials, and they seek relief through the Declaratory Judgment Act, 28 U.S.C.A § 2201.

---

[5] The plaintiffs explain: "[A] voter who is registered as Timothy Joseph Smith could validly sign as Timothy Joseph Smith, Timothy J. Smith, or T. Joseph Smith. But his signature *would not count* if he signed as Timothy Smith, Joseph Smith, or T.J. Smith—even if any of those happened to be the way that Smith is known to the world and the way that Smith always signs his name. This is because the statute requires at least one given name to be written out and at least one initial to be included for every given name. . . . Similarly, if a voter who is registered as 'Catherine Jones' printed her name as 'Cathy Jones,' her signature in support of the petition would be invalidated even if she properly *signed* 'Catherine Jones.' This is because the State Board invalidates all nicknames." *Id.* at ¶¶ 22-23.

10

The Supreme Court has explained that: "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 167 (4th Cir. 1990) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

An Article III justiciability gateway, the ripeness doctrine prevents federal courts from weighing in on a controversy until it is presented in "clean-cut and concrete form." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006)). "To determine if a case is ripe," a federal court must "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Lansdowne*, 713 F.3d at 198. As the Fourth Circuit explained, "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiffs who would be compelled to act under threat of enforcement of the challenged law." *Id.* (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)).

11

The uncertainties surrounding the submission of a new political party petition and the relative lack of hardship imposed on the Party demonstrate that this claim is insufficiently "clean cut and concrete" to be adjudicated here. Unlike in *Miller*, where the only uncertainty was whether another candidate would run for office in the future, *see Miller*, 462 F.3d at 319, here, it is unknown just how many signatures would be invalidated on the Party's hypothetical future petition and for what reason. The plaintiffs contend that the state invalidates signatures that are otherwise matched to registered voters for numerous reasons: omitted initials, omitted given names, the use of nicknames, and valid duplicates of previous invalidated signatures. The parties agree that the state has a valid interest in confirming that individuals who sign new party petitions are actual registered voters, and therefore each of the plaintiffs' grievances with the name standard presents a potentially separate constitutional challenge. There is no information in the record about the extent to which various components of the name standard rule contribute to allegedly needless invalidations, nor information about the various state interests advanced by § 6-203's multiple requirements for a signature to be valid. Such factual information is needed to properly define the legal question. Federal courts must tread lightly to avoid premature adjudication, and prudential doctrines of judicial restraint counsel particular caution in the face of factually underdeveloped constitutional questions. Given the contingencies remaining in this case, the name standard would be better litigated if and when there are concrete signature invalidations in the record.[6]

---

[6] Additionally, there is comparatively little hardship imposed on the Party by delaying the resolution of these potential constitutional issues. *Cf. Miller*, 462 F.3d at 317-18. The Party must collect 10,000 or more signatures irrespective of the name standard and it is allowed to do so in stages, such that it will know the precise number of outstanding signatures needed, or may choose to litigate the name standard after specific invalidations.

III.     **Conclusion**

For the foregoing reasons, the defendant's motion to dismiss will be granted.

A separate order follows.

_____7/11/19_____                              _____/s/_____
Date                                             Catherine C. Blake
                                                 United States District Judge

13